**EASTERN S. S. LINES, Inc. v. UNITED STATES.**

No. 223–52.

United States Court of Claims.

May 5, 1953.

Samuel I. Rosenman, New York City, Arthur J. Santry, Richard Bancroft, Boston, Mass., and Max Freund, New York City, on the briefs, for plaintiff.

E. Robert Seaver, Kansas City, Mo., Warren E. Burger, Asst. Atty. Gen., J. Frank Staley, Washington, D. C., on the briefs, for defendant.

MADDEN, Judge.

Both the Government and the plaintiff have made motions for summary judgment. We therefore consider the case on the basis of the undenied allegations of the petition, and the documents and affidavits presented by the parties.

The Steamship *Acadia,* owned by the plaintiff, had been for some time prior to April 29, 1942, chartered by the plaintiff to the United States Maritime Commission and used as an Army Transport. On April 29, 1942, the United States, acting through the Administrator, War Shipping Administration, entered into a bareboat charter, Contract No. WSA 1155, for the *Acadia.* The term of that charter was twelve months, plus such additional time as might be necessary to complete any voyage in which she might be engaged at the end of the twelve months. The charter provided that either party could, on notice, terminate the charter before the end of the twelve months. It provided that at the end of the term, the United States would redeliver the vessel in the same condition as on the date of delivery to the United States, ordinary wear and tear in commercial operations excepted, making all necessary repairs to restore her to that condition at its own expense. This charter did not give the United States the option, contained in the later charter involved herein, of redelivering the vessel to the plaintiff without restoring her. The charter hire was $1,295 a day.

On May 3, 1943, the United States, acting through the War Shipping Administration sent the plaintiff a telegram requisitioning on a bareboat basis, the *Acadia,* "pursuant to Section 902 of the Merchant

Marine Act, 1936, as amended." The telegram further said:

"Charter agreement to be tendered will provide for just compensation for use of vessels * * * in accordance with above mentioned provisions of law, such charter agreement to be substantially similar in form to existing charter covering vessels * * *."

Section 902, referred to in the telegram says in subsection (a), 49 Stat. 2015, 46 U.S.C.A. § 1242:

"In the case of a vessel taken and used, but not purchased, the vessel shall be restored to the owner in a condition at least as good as when taken, less reasonable wear and tear, or the owner shall be paid an amount for reconditioning sufficient to place the vessel in such condition."

Months passed before the United States submitted a charter to the plaintiff for the vessel. It continued to pay the $1,295 per day stipulated in the former charter. Early in 1944 it contended that it had been overpaying the plaintiff since the end of the twelve months covered by the earlier charter entered into in 1942. The plaintiff denied this contention and the United States ceased to pay charter hire, though it continued to use the vessel.

In April 1944, the United States submitted to the plaintiff a proposed charter for the *Acadia*. The plaintiff refused to execute it. Negotiations ensued. The discussions involved also the unpaid charter hire referred to above, similar unpaid charter hire for four other vessels, and other claims which the plaintiff was making with regard to still other vessels. The discussions contemplated that if the parties could agree on an amount for charter hire per day, that agreed amount should apply retroactively to the date of the requisition. The Government representative in the discussions gave the plaintiff's representatives a copy of a charter form, Form 110, which had been published in the Federal Register on July 1, 1943, and said that that was the form prepared for such requisitions, and which should be used with respect to the plaintiff's vessels. The plaintiff's representatives took the form and said that they would study it and communicate their views.

Form 110 contained, in its Part I, the following language:

"Whereas, pursuant to Section 902 of the Merchant Marine Act, 1936, as amended, and the President's Executive Orders Nos. 9054 and 9244, the Administrator, War Shipping Administration, has requisitioned the use of the Vessel, which Vessel at the time of such requisition was under charter from the Owner to the United States by Bareboat Charter dated as of April 29, 1942, consisting of a charter contract and addendum thereto, Contract No. WSA–1155.

"Now therefore, pursuant to said Section 902, the Administrator, War Shipping Administration, hereby transmits to the Owner this Charter, consisting of Part I and Part II * *."

In Part II there was, *inter alia*, clause 7, as follows:

"Clause 7. Before redelivery the Vessel shall be surveyed jointly by representatives of the Charterer and the Owner, or by a surveyor satisfactory to both the Charterer and the Owner, to determine the condition of the Vessel. * * * Before redelivery, the Charterer, at its own expense, and on its time, shall restore the Vessel to at least as good condition and class as upon delivery, ordinary wear and tear excepted, and do all work and make all repairs necessary to satisfy any outstanding classification or steamboat inspection requirements necessary to place her in such condition and class, and perform all work required by Clause 2, Part II; * *. Provided, further, that at the Charterer's option, redelivery of the Vessel to the Owner may be made prior to satisfying such requirements or prior to completion of such repairs or work, in which event the Charterer shall pay to the Owner the amount reasonably expended to place the Vessel in such class and condition, and to perform the work of restoration under Clause 2,

Part II, and in addition thereto shall pay (a) an amount equal to the hire payable under this Charter for the use of the Vessel for the period of time necessary for such restoration work and repairs including any time lost awaiting available facilities; and (b) any such further amount necessarily expended by the Owner for insurance, wages and subsistence of the Master, officers and crew, and other Vessel expenses incurred during such period of time for restoration work and repairs, the Owner at all times to use due diligence, dispatch and economy. Provided, further, however, that if the Charterer and the Owner agree, the Charterer's obligation under this Clause 7 and under Clause 2, Part II, may be discharged by a lump sum payment to the Owner at the time of redelivery of the Vessel to the Owner, or other mutually satisfactory agreement. * * *"

After a study of the proposed charter, the plaintiff wrote the Government objecting to the provision in Clause 7 which gave to the Government the option of returning the vessel unrestored and paying the amount reasonably expended by the owner to restore the vessel. The letter said that that course should be followed only if both parties agreed to it. The Government responded as follows:

"Your suggestion relative to redelivery at the option of the Administration cannot be accepted in view of the plain language contained in Section 902, which gives the Government the option of redelivering the vessel in the same condition as delivered, less ordinary wear and tear, 'or the owner shall be paid an amount for reconditioning sufficient to place the property in such condition'. In view of the plain language of the statute as above quoted, I do not feel that any administrative official of the Government can waive the option provided in the charter without strong reasons for so doing. I assume that you are aware that this option is uniformly provided in all requisition charters of the Administration."

On April 11, 1945, the Government's representative sent the plaintiff a form charter for the *Acadia,* along with similar charters for the plaintiff's other vessels. Some formal changes, not here relevant, were suggested by the plaintiff, whereupon charters in final form were prepared and executed by the parties. The charters, including the charter for the *Acadia,* contained Clause 7 as quoted above.

From October 16, 1942, to February 7, 1946, the *Acadia* was used by the Army Transport Service as a troop transport and hospital ship. After February 7, 1946, she was used for the carriage of dependents of service men from the United States, and the carriage of troops returning to the United States. Early in 1947 discussions began between the plaintiff and the United States Maritime Commission looking to the redelivery of the *Acadia* to the plaintiff. A survey was made by experts authorized by the plaintiff and the Maritime Commission to determine what had to be done to restore the vessel in accordance with the terms of the charter. The Government's surveyor, Gielow, Incorporated, estimated the probable cost of restoration at $3,671,612. The Maritime Commission's own Technical Department's estimate was $4,278,390. The estimate of the plaintiff's surveyor, Newport News Shipbuilding and Dry Dock Company was $4,026,000 not including any allowance for extras.

On May 16, 1947 the plaintiff received a telegram from a representative of the Maritime Commission offering, subject to the approval of the Commission, to pay the plaintiff $3,590,000 as a lump sum settlement of all the Government's redelivery obligations with respect to the *Acadia.* On May 19 the plaintiff by telegram advised that it was willing to accept that sum. The Maritime Commission then telegraphed that it would approve the settlement only if the plaintiff would agree to use the $3,590,000 for restoring the vessel. The plaintiff refused to so agree, saying that the sum was not sufficient to cover the actual costs of the restoration.

On July 3, 1947, the Commission telegraphed the plaintiff that it would redeliver the *Acadia,* unrestored, on July 23, 1947. The telegram further stated:

"You are hereby notified that in accordance with the second proviso clause of clause 7, Part II of the said charter the Commission will pay the amount reasonably expended to place the Vessel in the class and condition required by the Charter plus the allowances provided under subclauses (A) and (B) of Clause 7: provided that in no event will the Commission be liable for an amount exceeding just compensation for the Vessel in sound condition at the time of redelivery as determined pursuant to Clause D of the Charter."

Clause D of the Charter said:

"Clause D. Total loss liability: In the event of the actual or constructive total loss of the Vessel as provided in Part II of this Charter, the Charterer shall pay to the Owner a sum to be mutually agreed upon but failing such agreement, shall pay just compensation for the loss of the Vessel. In the latter event, the Owner may accept 75 per centum of the sum determined and tendered by the Charterer and shall be entitled to sue the United States to recover such further sum as added to such 75 per centum will make up such further amount as will be just compensation under the laws and Constitution of the United States."

The plaintiff responded that Clause D was inapplicable and that unless the stated limitation of liability was withdrawn, the Government would be in violation of its redelivery obligations. The Commission responded, in effect insisting on the limitation of liability, and saying that the determination of the amount had been referred to a Committee on Just Compensation. The plaintiff telegraphed the Commission on July 16, 1947, that it would not accept redelivery for fear that it would be deemed an acquiescence by it in the Commission's position on the extent of its liability.

Thereupon the Commission wired the plaintiff:

"* * * your acceptance of redelivery of Acadia on or before July 23, 1947 * * * will not constitute acquiescence by you as to such limit or as to amount payable."

The plaintiff and the Commission then exchanged telegrams to the effect that redelivery was to be taken under the second proviso of Clause 7, with no conditions attached. On July 23, 1947, the plaintiff accepted redelivery and signed a redelivery receipt which, in effect, repeated the terms of the second proviso of Clause 7.

After accepting redelivery, the plaintiff requested the Commission to agree to a procedure whereby the Commission would approve an estimate of the cost of restoring the *Acadia,* and would state the amount which the Commission would regard as "just compensation" for the vessel, the Commission having said that it would not pay more than "just compensation." An agent of the Commission urged, in negotiation, that $2,575,000 would constitute just compensation, and that the plaintiff should accept that amount as a lump sum settlement. The plaintiff rejected the proposal. The Commission on March 19, 1948, wrote the plaintiff a letter saying that it was and at all times had been prepared, to pay the plaintiff "the amount reasonably expended" to restore the vessel "subject always to the legal limits on such amount imposed by applicable law." The letter went on to say that the Commission thought it courteous "in view of the large sum of money involved, to state that it construes the legal limit of its monetary obligation under the Charter to be the agreed value of the *Acadia* thereunder, namely just compensation." The letter then said that the determination of the value of the vessel would entail the study of a large volume of data and that:

"* * * In view of the impingement on such a determination of the enhancement clause of Section 902, Merchant Marine Act, 1936, as amended, we are not prepared to proceed further with such determination unless there is satisfactory indication that

your company is prepared to undertake the restoration of the vessel."

The reference to the enhancement clause of Section 902 has not been explained.

The plaintiff advised the Commission that it was the Commission's duty to tender to the plaintiff an amount sufficient to pay for the restoration of the *Acadia,* as well as to cover the other redelivery obligations of the Government. Nevertheless the plaintiff said that it would, if it received the assurance of the Commission that it would pay the entire reasonable cost of the restoration, without limiting the payments to the restored value of the vessel as of the redelivery date, proceed at once to restore the vessel. This communication was not answered by the Commission.

So the matter stands. The plaintiff has had its ship since July 23, 1947. It has not restored, or begun to restore, the ship. The Government says that its obligation under the charter, it having exercised the option given it by the first proviso of Clause 7 when it redelivered the ship to the plaintiff, is only to pay the plaintiff "the amount reasonably expended," in restoring the vessel. Since the plaintiff has not expended anything, the Government is not yet obligated to pay anything. The plaintiff contends that the language of Clause 7, in the circumstances in which the language was used, means that the Government obligated itself to pay to the plaintiff, at the time of redelivery, the costs which the plaintiff would have to incur to restore the ship. So interpreting Clause 7, the plaintiff urges that since the Government's surveyor, Gielow, Inc. estimated in 1947 that the probable cost of the Government's redelivery obligations was $3,671,612, and the Maritime Commission's own technical staff then estimated those costs at $4,278,390, the plaintiff is entitled to a present adjudication that the Government owes at least the latter amount, leaving open for trial only the question of how much more, if anything, it owes.

■■■ We consider first the interpretation of the contract. The words of the pertinent proviso of Clause 7, taken by themselves, would, fairly plainly, mean that the Government's payment for restoration was to be reimbursement for expenditures made by the plaintiff. "The amount reasonably expended" would normally refer to actual expenditures, not to an estimate of what those expenditures might turn out to be. If an estimate had been contemplated, the charter should have lodged in some person the authority to make that estimate, or should have provided for the arbitration of differences between the estimates of the parties. The surveys actually made by representatives of the parties resulted in wide disagreement, and the charter provided no method of resolving the differences. There was further language in the proviso saying that the Government should:

"* * * pay (a) an amount equal to the hire payable under this Charter for the use of the Vessel for the period of time necessary for such restoration work and repairs including the time lost awaiting available facilities; and (b) any such further amounts necessarily expended by the owner for insurance, wages and subsistence of the Master, officers and crew, and other Vessel expenses incurred during such period of time for restoration work and repairs, the Owner at all times to use due diligence, dispatch and economy."

This further language could not have meant payment in advance on the basis of an estimate. It meant hire for the time the vessel was actually awaiting facilities or in the process of being restored and reimbursement for expenditures actually made by the owner.

The plaintiff, in support of its interpretation of the contract as requiring payment in advance, on an estimate of the costs of restoration, suggests a number of circumstances which, it says, are significant. The bareboat charter which preceded the one here in controversy and which covered the *Acadia* from April 29, 1942 to April 29, 1943 did not give the Government the option to deliver the vessel unrestored. That fact, by itself, would seem to have no significance, since it is plain that both parties were aware of the presence, in the later charter, of the options contained in Clause 7. The telegram making the requisition which resulted in the charter here in ques-

tion said that the requisition was made pursuant to Section 902 of the Merchant Marine Act of 1936, and that the formal charter agreement to be tendered would be "substantially similar in form to existing charter covering vessels". As just stated, the charter actually tendered many months later differed materially from the 1942 one, but it was agreed upon after much negotiation and discussion of its terms. The telegram's reference to Section 902, the plaintiff urges, amounted to an incorporation of the provision of Section 902 which says:

"In the case of a vessel taken and used, but not purchased, the vessel shall be restored to the owner in a condition at least as good as when taken, less reasonable wear and tear, or the owner shall be paid an amount for reconditioning sufficient to place the vessel in such condition."

█ The language of Section 902 does seem to contemplate payment in advance, though we do not find it necessary to decide, and we do not decide, whether it does or not. If the telegram of requisition had not been followed by a formal charter agreed upon by the parties, and we had to decide what were the plaintiff's rights under the telegram, it would be necessary to decide that question. We have, however, no idea that Congress intended the language of 902 quoted above, which language is not, in itself, very clear, to be so mandatory that competent parties could not, by agreement, provide that the Government's payment for restoration should be made after the expenditure by the owner, and not before. Indeed, in Matson Navigation Co. v. United States, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336, the Supreme Court held that a ship owner could, by contract, waive its constitutional right to just compensation by agreeing that a specified sum of charter hire should discharge all of the Government's obligations to it.

The plaintiff points, in support of its contention that Clause 7 contemplated payment by the Government, in advance, of restoration costs, to language in a letter written by plaintiff's counsel to the Government, while the plaintiff was deliberating as to whether it would sign the tendered charter. This

letter, written for the purpose of objecting to the inclusion of the option of the Government to deliver the vessel unrestored, and urging that that should be permissible only if both parties agreed to it, said:

"Clause 7 provides for an option in the Charterer (the United States) to redeliver the vessel without satisfying requirements for its account upon the payment of the amount reasonably expended to place the vessel in class and condition, etc. We feel that the arrangements should not be at the option of the Charterer but should exist only in the event of mutual agreement."

The plaintiff attaches importance to the words, "upon the payment". We do not, and we think the writer of the letter did not. The quoted words, with the ones that follow, are, to say the least, highly ambiguous as to whether they refer to payment in advance, or after expenditures have been made. We have no idea that plaintiff's able counsel would have used ambiguous language with relation to a point to which he attached importance. The letter was about a wholly different matter, and the quoted words were used casually.

In answer to the letter of plaintiff's counsel, urging the omission of the Government's option to deliver the vessel unrestored, the General Counsel of the Maritime Commission wrote that since Section 902 provided for the option in the Government of delivering the property unrestored, the writer did not feel that an administrative officer of the Government could waive the option without strong reasons for so doing. In his reference to Section 902 the General Counsel quoted the language of that section which we have quoted above. The plaintiff says that the quotation of this language gave its officers the impression that the charter then under discussion contemplated payment in advance for restoration to be done by the owner. But the correspondence had nothing whatever to do with that question. It concerned whether the Government should have the privilege, in any event, of redelivering the vessel unrestored. If the sticking point had been that of whether payment should be in advance or after the expenditures had been

made, it is incredible that plaintiff's able and experienced counsel and its president would not have raised that question and gotten an answer to it, since Clause 7, then in negotiation, at least *prima facie,* says the opposite of what they now contend for. The Government presents a letter from counsel for the plaintiff written in 1947, at the time of the redelivery of the vessel, and in answer to a request that the plaintiff give reasons why the Maritime Commission should commit itself as to what expenditures for restoration it would approve. This letter said, in part:

"* * * The Clause permits the Charterer to return the Vessel without having discharged that obligation but in that event imposes on the Charterer the obligation 'to pay the Owner the amount reasonably expended to place the Vessel in such class and condition'. It seems to us clear that where the Charterer has seen fit to return the Vessel unrestored to the Owner and has incurred an obligation to reimburse the Owner for restoring her, the Charterer has a duty to cooperate with the Owner in establishing the amount that may properly be expended to restore the Vessel.

"Since the Owner is to incur costs that are to be reimbursed by the Commission, it is clear that at some stage the Commission must either approve or disapprove the Owner's expenditures. The question is, at what point of time is it to be inferred that this approval or disapproval shall be expressed? The Commission's telegram seems to suggest that the Commission has the right to stand by during the course of restoration, refusing any cooperation with the Owner, and reserving its approval or disapproval until after the Owner has expended sums running into several million dollars."

The plaintiff says that the quoted letter was written in the course of negotiations for a settlement of conflicting views of the plaintiff and the defendant, and therefore cannot be taken as an admission against interest. The significance of the letter, however, is that even at the late date at which it was written, and when the parties were already in controversy over their rights it had not even occurred to the plaintiff that the language of Clause 7 meant what the plaintiff now claims that it meant. Not until April 2, 1948, many months after redelivery of the vessel, which were months of controversy as to the obligations of the parties under the charter, did the plaintiff suggest the interpretation which it now puts on Clause 7. That being so, we could not possibly conclude that it had that meaning, or that the plaintiff thought it had that meaning when the charter in question was executed.

The plaintiff presents, as an alternative ground for recovery, the following proposition. Assuming that the proviso in Clause 7 of the charter only obligated the Government to reimburse the plaintiff after the plaintiff had restored the ship, the Government's obligation to pay nevertheless matured earlier than it would otherwise have done, because the Government committed an anticipatory breach of its contract by notifying the plaintiff that it would not fully reimburse the plaintiff, but would only pay such amount as would constitute the fair value of the ship, when restored. The Government did so notify the plaintiff, and, unless the Government's legal position, that that was the extent of its legal obligation, was correct, we think it did commit an anticipatory breach.

We think we may assume, from the general aura of the case, that the costs of restoration of the *Acadia* would be greatly in excess of the value of the restored ship. The plaintiff, quite naturally, is not suggesting a low value for the restored ship, since if it should turn out that that is the measure of its recovery, it would regret its suggestion. The Government is taking the stiff position that nothing is due *now* under Clause 7, and that what might be due after expenditures have been made, is irrelevant. We assume, therefore, in order to expose the question for examination, that after some $4,000,000 had been spent in restoring the ship, it would be worth $2,000,000. As we have said, the Government notified the plaintiff that, after it had spent the $4,000,000 it would be reimbursed the $2,000,000.

If, as the plaintiff claims, and as Clause 7 seems to say, the Government's obligation was to reimburse the plaintiff for the whole $4,000,000 when the plaintiff should have expended it, the Government's notice put the plaintiff in an impossible position. If it spent the $4,000,000 it would be offered $2,000,000 in exchange for a receipt in full for all the Government's obligations. Its alternative would be a lawsuit for $4,000,000 with a considerable certainty of winning $2,000,000 and a chance of winning $2,000,000 more.

■ The Government says that its notice was merely a courtesy extended to the plaintiff to avoid any feeling of overconfidence which the plaintiff might have. We think that when one is, under a contract, to become obligated to pay money after the other party has performed, and he advises the other party that, even after he has performed, the payment will not be made, in the amount agreed upon, except possibly after a lawsuit, the party so notified has the right, if his interpretation of the contract is correct, to treat the contract as breached, and recover his damages resulting therefrom. The adage concerning putting good money after bad is relevant.

We must determine, then, which of the parties, if either, has interpreted the charter agreement correctly. According to the plaintiff's interpretation the Government has now become obligated to pay it $4,000,000. Candour compels the plaintiff to say that it will not feel obliged to spend the $4,000,000 when it gets it, to restore the *Acadia*. Common sense and reality tell us that it will not so spend the money, since after the expenditures it would have only a $2,000,000 ship. The result would be that the Government would pay out $2,000,000 more than the plaintiff had lost by the Government's chartering and use of its ship. The extra $2,000,000 would not be a subsidy to get ships built or sailing. The *Acadia* would still rust at anchor. We decline to use the doctrine of anticipatory breach to produce such a result.

The Government's position is that it will not reimburse the plaintiff for the expenditure of $4,000,000 to produce a $2,000,000 ship. There is economic sense in that, and

if the contract requires such an expenditure of public funds to produce such a result, the contract should never have been made. But the Government says that it will not pay even the $2,000,000, which is the value of what it took from the plaintiff when it used up the plaintiff's ship, unless the plaintiff in the first instance pays out $4,000,000 of its own funds, of which $2,000,000 will be completely wasted and will not be recovered. If the contract means that, it is a harsh and unconscionable contract which the plaintiff should not have agreed to and which the Government should be ashamed to insist upon.

We conclude that neither party is offering us a reasonable interpretation of the charter contract. We think that neither party anticipated what actually happened, *viz.* that the market for old ships on the one hand, and the market for labor and materials, on the other, would be such as to make the restoration of old ships a useless and wasteful expenditure of public funds.

■■ The charter contained Clause D which we have quoted hereinbefore. That clause said that "in the event of the actual or constructive total loss of the Vessel as provided in Part II of this charter, the Charterer shall pay to the Owner a sum to be mutually agreed upon but failing such agreement shall pay just compensation for the loss of the Vessel". It further provided that the owner might accept 75 percent of the amount determined to be just compensation, and might sue for any further amount which it claimed. We assume that the loss provision of Clause D does not fit the situation which is before us. But when the fact is that, to restore the ship, either the Government or the owner or the two combined must wastefully and uselessly pay out twice as much as the ship will be worth when restored, the ship is worse than a total loss, and falls within the reason of the total loss clause of the charter. We have concluded that it is not covered by other provisions of the charter, as interpreted by the parties in their contentions before us. The truth is that what happened was not anticipated by the parties, and hence not expressly provided for in the charter. In that situation, we may assume that the parties would, if they

had anticipated the event, have desired that the problem be fairly resolved. We think that the loss provision of Clause D solves it with perfect fairness. The plaintiff recovers what it has lost. The Government pays what its use of the vessel cost the plaintiff. No money, either of the plaintiff or the public is wasted.

While we use the loss provision of Clause D by analogy to find the implied intent of the parties, in the situation that has developed, we think that the plaintiff is not required to go back to the agency for an administrative determination of the value of the *Acadia,* unless it chooses to do so. While the Government mentioned Clause D in its notice of redelivery, it did not thereafter make the determination of value or the tender of compensation contemplated by Clause D. It would not be fair to now require the plaintiff to go back and pursue the administrative remedy, thus perhaps taking a risk that its right to sue might be barred by the statute of limitations.

■ The plaintiff has urged that, regardless of the waste of public money that would be entailed by compelling the Government to pay $4,000,000 when the plaintiff's loss is $2,000,000, the weight of authority is that what is "nominated in the bond" will be compelled, regardless of economic waste. We think that is not the law. With the exception of the cases involving covenants by tenants to restore the leased premises, which seem to be in a class by themselves, and some cases involving covenants to drill oil wells on a chance of discovering oil, where it is usually impossible to tell what would have been the result of the drilling, there is little authority to support the plaintiff's contention. Rather than extending this already too long opinion, we refer to the collection of the cases in 123 A.L.R. 515.

The motions for summary judgment of both the Government and the plaintiff are denied. The case will be assigned to a commissioner of this court for trial upon the question of the value of the *Acadia.*

It is so ordered.

JONES, Chief Judge, and HOWELL and LITTLETON, Judges, concur.

WHITAKER, Judge (concurring).

The Constitution provides for the payment of just compensation to an owner whose property is taken either absolutely or for use. The Merchant Marine Act also provides for the payment of just compensation, but it says that where property is taken for use, the parties may enter into a charter agreement, which, if entered into, will govern the rights of the parties. In this case the parties did enter into a charter agreement.

But the majority opinion says that this agreement did not cover the situation with which we are presented in this case. But whether it does or not, the fundamental obligation of the Government is to pay just compensation to the owner whose property is taken. If the agreement does cover the situation presented, it ought to be construed to arrive at this result, if possible.

I am in doubt whether the charter agreement can be properly construed to arrive at this result. As the majority opinion says, it seems to me it simply does not cover the case presented to us. If it does not, I think we must then fall back upon the Government's primary obligation to pay just compensation. The purpose of the charter was to agree in advance on what was just compensation, or on the formula for ascertaining it. By it they sought to provide the means for determining just compensation in all circumstances, but they overlooked the circumstance presented in this case. Having overlooked it, the charter gives us no guide, and, so, we must determine just compensation in this case without regard to it.

Just compensation, in my opinion, is what the majority opinion says it is.