**GRANITE CONSTRUCTION COMPANY, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant– Appellee.**

No. 91–5107.

United States Court of Appeals, Federal Circuit.

April 1, 1992.

Rehearing Denied May 29, 1992.

---

Adrian L. Bastianelli, III, Dempsey, Bastianelli, Brown & Touhey, Chartered, Washington, D.C., argued, for plaintiff-appellant. With him on the brief, was Lisa A. Federici, of counsel.

Scott E. Ray, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief, were Stuart E. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief, was Gary A. Moore, Office of Counsel, U.S. Army Corps of Engineers, Mobile, Ala., of counsel.

Before NEWMAN, Circuit Judge, COWEN, Senior Circuit Judge, and LOURIE, Circuit Judge.

COWEN, Senior Circuit Judge.

In this Wunderlich Act case, Granite Construction Company (Granite) appeals from the decision of the United States Claims Court, 22 Cl.Ct. 831, which affirmed the decision of the Corps of Engineers Board of Contract Appeals (Board), ENG BCA No. 4496, 89–1 B.C.A. (CCH) ¶ 21,447, 1988 WL 143116. The Board denied Granite's claim for recovery of costs incurred in the removal and replacement of waterstop in a lock and dam construction project. For the reasons to be set forth, we reverse and remand.

## BACKGROUND

On October 26, 1976, Granite entered into a $36,263,924 contract with the U.S. Army Corps of Engineers (Corps) for the construction of a lock and dam near Aberdeen, Mississippi.[1] The dam and lock walls consist of a series of concrete monoliths that are 60 feet high, 42 feet long, and 30 feet wide. The contract required Granite to embed polyvinylchloride (PVC) waterstop in the vertical joints between each monolith in order to prevent water leakage.

After approximately 10 percent of the waterstop was permanently embedded in the monoliths, the Corps tested the waterstop, determined that it did not meet the contract requirements, and required Granite to remove and replace virtually all of the installed waterstop.

After removing and replacing the waterstop, Granite sued its suppliers Alpha Extruders (Alpha), Vimco Concrete Accessories (Vimco), Saf-T-Grip Specialties (STG), and Stafford in a United States district court and recovered $400,000 from Vimco and Stafford by settlement. In addition, Granite obtained a default judgment against Saf-T-Grip and Alpha for $894,750. Granite assigned its rights against the latter two suppliers to insurers, and agreed to pursue a claim against the Corps. Granite also agreed to furnish one-half of any recovery to Vimco and Stafford or their insurers.

Granite filed a $3.8 million claim with the contracting officer. On appeal, the Board conducted a trial on liability in May of 1983. On December 19, 1988, the Board issued a split decision denying Granite's claim in its entirety.[2] The Board majority determined that the contract required Granite to inspect and test the waterstop to ensure that it met contract specifications. The Board further determined that the government had a right to insist upon strict compliance with the contract specifications and to require the complete removal of the embedded STG waterstop. One judge concurred and dissented in part, concluding that Granite was entitled to delay damages for the Corps' failure to periodically test the waterstop. The dissenting judge also found that the Corps arbitrarily and capriciously failed to evaluate the adequacy of the waterstop for the Aberdeen project.

Pursuant to the Wunderlich Act, 41 U.S.C. §§ 321–22 (1978), Granite sought judicial review of the Board's decision with the United States Claims Court. Upon review of the Board's decision in accordance with the standards provided in the Wunderlich Act, the Claims Court agreed with the Board and granted the government's motion for summary judgment.

## DISCUSSION

### I.

### *The Standard of Review*

■ Because Granite entered into the Aberdeen lock and dam contract prior to the effective date of the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 601 *et seq.* (1988), and did not elect CDA coverage, the disputes provisions of the Wunderlich Act govern this appeal. *Essex Electro Eng'rs, Inc. v. United States,* 702 F.2d 998, 1002–03 (Fed.Cir.1983). The Wunderlich Act provides:

§ 321. *Limitation on pleading contract provisions relating to finality; standards of review*

---

1. The facts set forth in this opinion consist of findings made by the Board, facts which both parties have agreed upon, or facts which the court has found based upon undisputed evidence. *See Commissioner v. Gordon,* 391 U.S. 83, 95 n. 8, 88 S.Ct. 1517, 1524 n. 8, 20 L.Ed.2d 448 (1968); *Ordnance Research, Inc. v. United States,* 609 F.2d 462, 465, 221 Ct.Cl. 641 (1979); *Koppers Co. v. United States,* 405 F.2d 554, 559, 186 Ct.Cl. 142 (1968). *See also King v. Commissioner,* 458 F.2d 245, 249 (6th Cir.1972).

2. The reporter's transcript shows that Administrative Judge McFadden conducted the hearing. During oral argument before the Claims Court, counsel for Granite informed the court that Judge McFadden retired shortly after the hearing and that Administrative Judge Jockisch joined the Board in 1988. Judge McFadden did not participate in the Board's decision, which was written by Judge Jockisch. Administrative Judge Solibakke, Chairman of the Board, concurred. Administrative Judge Steele filed an opinion concurring in part and dissenting in part.

No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limited judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any decision shall be final and conclusive unless the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

§ 322. *Contract provisions making decisions final on questions of law*

No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

Board decisions under the Wunderlich Act are subject to two stages of appellate review, first by the Claims Court and then by this court. The Claims Court reviews the legal conclusions of the board *de novo* and factual findings under the substantial evidence test. Although Granite appeals from the decision of the Claims Court, we essentially review the underlying decision of the board under the same standards applied by that court. *Cf. Matsushita Electric Indus. Co. v. United States,* 929 F.2d 1577, 1578 (Fed.Cir.1991); *American Permac, Inc. v. United States,* 831 F.2d 269, 273 (Fed.Cir. 1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988); *See also Vista Scientific Corp. v. United States,* 808 F.2d 50, 52 (Fed.Cir.1986).

## II.

### The Waterstop Testing Issue

#### A.

The first issue presented is whether the government is liable for the failure to periodically test the waterstop. Granite argues that the Corps was required under the inspection provisions of the contract to perform a specified number of tests on the waterstop to determine whether the material complied with the specifications. Granite contends that the government's failure to test the waterstop before it was permanently embedded in the structure caused the contractor to incur costs exceeding $3.8 million. Had the government conducted periodic testing of the waterstop in a timely fashion, Granite argues, the nonconforming waterstop would have been discovered prior to installation and remedied by Granite at a much lower cost.

#### B.

The provisions of the contract pertaining to the inspection and testing of the waterstop are set forth in the decisions of the Board and the Claims Court, to which the reader is referred for a complete statement of these terms. It will suffice for our purpose to paraphrase the pertinent sections of the specifications.

Paragraph 14.3.3 of the technical specifications, entitled "Testing," provided that the contractor should submit samples of the waterstop to the Corps, but that all testing of the waterstops would be performed by and at the expense of the government, which had the right to reject any sample which failed to meet the requirements of CRD-C 572-74. This contract provision, in turn, contained detailed requirements for testing samples of the finished waterstop, including tensile strength, ultimate elongation, low temperature brittleness, stiffness in flexure, and accelerated extraction, and stated that the waterstop may be rejected if it failed to meet any of the requirements of the specification. Paragraph 14.3.3.1 specified that each sample to be tested by the government should be at least 12 inches long and taken from every 200 feet of waterstop supplied by Granite.

General Provision clause GP-10(d) stated that all inspection and tests by the government should be performed in a manner that would not unnecessarily delay the work. Clause GP-32 required Granite to maintain a general inspection system to assure compliance with the specifications.

Under the heading of Special Provisions, clause SP–38 required the contractor to maintain an effective quality control system in accordance with GP–32 and to perform inspection and testing of all items of work, including the work of subcontractors, to monitor compliance with the specifications and drawings. This clause of the contract also provided: "[w]here the technical provisions of the contract provide for Government quality control or assurance by inspections or testing, it shall not relieve the contractor from the responsibility of doing such testing or inspection as is necessary to assure himself or the Government that the specifications are being met." Thus, the contract contained a technical provision which held the Corps responsible for testing the waterstop and a special provision which stated that the technical provision did not relieve Granite from its duty to supply waterstop which met the contract specifications.

### C.

On March 4, 1977, Granite ordered 7,100 linear feet of PVC waterstop from Vimco. Vimco purchased the waterstop from STG, which obtained the material from Alpha. The Corps requested four samples of waterstop for testing by the Waterway Experiment Station. On July 18, 1977, the Corps informed Granite that the samples met the requirements of CRD–C 572–74. Subsequently, STG requested permission to supply a different color waterstop. After Granite transmitted this request, the Corps became concerned and sought assurance that the material to be shipped was the same as the original samples. On September 16, 1977, STG certified that the waterstop material would be from the same lot and compound as the originally approved samples. The request for a change in color was eventually withdrawn.

Granite received the first shipment of STG waterstop in October 1977. Mr. Baker, a government inspector, investigated the contractor's storage area in November 1977. He "looked over" the STG waterstop but did not perform a "quality check" of the material. On November 19, 1977, a Granite quality control engineer certified that all material present on the job site met applicable contract specifications and requirements.

On April 3, 1978, Granite began embedding the waterstop. The Corps conducted a visual inspection of the project and noticed dimensional differences in the waterstop material. Upon inquiry, STG certified on April 27, 1978, that the waterstop was "manufactured at one time from one lot and shipped complete to the above project."

In May 1978, Granite realized that STG had not shipped all 7,100 linear feet of waterstop to the job site. Granite contacted the subcontractor, who sent a second shipment around June 1, 1978. STG certified that the second shipment was from the same lot as the first shipment. The Corps noticed that the material from the second shipment looked different than the first. Granite showed the Corps the STG certification, but did not transmit the certificate to the government until almost a year later because the contractor became convinced that the waterstop in the first and second shipments was not from the same lot.

In early June, the Corps decided to test the second shipment to determine whether the material complied with the contract specifications. The Corps never informed Granite that it did not perform further testing of the waterstop after the original lot test. Up to this time, Granite apparently thought the Corps had been periodically testing the material from the first shipment. Except for samples of the waterstop taken from the original lot, Granite did not submit any samples of the waterstop to the Corps for testing. Four of the five samples taken by the Corps from the second shipment failed to meet the numerical test values for ultimate elongation and tensile strength.

On June 22, 1978, the Corps informed Granite that the second shipment of waterstop was rejected. The Corps also directed Granite to shut down its concrete operations, which were on the critical path. By this date, Granite had already embedded 800 linear feet of waterstop from the first and second shipments in the concrete mon-

oliths. On June 23, Granite tendered samples from the first shipment to the Corps. The Corps notified the contractor on June 26 that the material from the first shipment did not comply with the specifications. The results indicated that the waterstop tested 13 percent below the tensile strength and ultimate elongation requirements set forth in CRD–C 572–74 and did not meet test values for low temperature brittleness.

On June 26, 1978, the Corps rejected all the embedded waterstop and advised Granite that it would accept nothing less than waterstop which complied with the specifications of the contract.

### D.

The essential facts regarding the government's liability for the failure to periodically test the waterstop are undisputed. Therefore, the issue involves questions of contract interpretation which the court decides *de novo*. *Hol–Gar Mfg. Corp. v. United States*, 351 F.2d 972, 974, 169 Ct.Cl. 384 (1965).

■ The right of the government to inspect work generally does not relieve the contractor of the responsibility to perform in accordance with the contract specifications. *Kenneth Reed Constr. Corp. v. United States*, 475 F.2d 583, 590, 201 Ct.Cl. 282 (1973). Granite concedes that the STG waterstop did not meet the contract requirements. However, Granite argues that paragraph 14.3.3 of the technical specifications and CRD–C 572–74 shifted primary responsibility to the Corps for ensuring that the waterstop material complied with the specifications.

■ It is well settled that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions. *B.D. Click Co. v. United States*, 614 F.2d 748, 753, 222 Ct.Cl. 290 (1980). When this well-established rule is applied to the specifications and the uncontroverted facts, we conclude that the contract provisions placed the responsibility for testing the waterstop on the government and the ultimate burden on the contractor to provide the government with conforming waterstop.

Both parties understood that the Corps was responsible for testing the waterstop. On November 1, 1977, the Corps Area Engineer sent the Resident Engineer a memorandum reading in pertinent part:

2. Quality assurance testing by the Government falls into two categories:

a) Those tests that are *solely* the responsibility of the Government, and

b) Those tests that are *required* to ensure the effectiveness of the Contractor's quality control program.

3. Those materials that are to be tested by the Government, and that are not part of the Contractor's quality control program are ...

\*      \*      \*      \*      \*      \*

c) Waterstops. This material is tested by WES in accordance with procedures outlined in the specifications, CRD–C–513 and CRD–C–572 [emphasis added].

In accordance with this interpretation, the Corps requested and Granite initially furnished samples of the waterstop for inspection and testing by the government. This course of conduct reflects the parties' understanding that the government's responsibility to test the waterstop was separate from Granite's obligation under SP–38 to provide and maintain an effective quality control system. *See Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed.Cir.), *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983).

■ Although the contract obligated the government to test the waterstop, Special Provision 38 prevented the contractor from disclaiming liability for installing nonconforming waterstop material. The lack of government inspection does not relieve the contractor of the burden of providing conforming materials under the contract. *Kaminer Constr. Corp. v. United States*, 488 F.2d 980, 986–87, 203 Ct.Cl. 182 (1973). Nor can the contractor properly rely on government inspection for correction of errors. *Cf. Kenneth Reed Constr.*, 475 F.2d at 590. Therefore, Granite is not entitled

to compensation for the direct costs of removal and replacement of the STG waterstop because of the government's failure to timely inspect the waterstop.

On the other hand, clause SP–38 should not be construed to relieve the Corps from all liability for failing to perform its contractually mandated testing duties. To decide otherwise would render meaningless technical provisions 14.3.3 and CRD–C 572–74, which required the Corps to test all waterstop, and clause GP–10, which obligated the government to inspect without unreasonably delaying the work. *Cf. Thompson Ramo Wooldridge Inc. v. United States*, 361 F.2d 222, 228–29, 175 Ct.Cl. 527 (1966). Rather, the Corps remained responsible under the technical provisions, when these are read in conjunction with clause GP–10, for performance delays attributable to an unreasonable failure to conduct periodic testing of the waterstop. *See Martell Constr. Co.*, ASBCA No. 23679, 80–1 B.C.A. (CCH) ¶ 14,429 at 71,-137, 1980 WL 2841 (1980). In reaching that conclusion, we cannot overlook the fact that Granite affirmatively represented to the government that the waterstop conformed to the specifications. The Board found that the certifications Granite received from suppliers and furnished to the government misled the Corps into believing that all waterstop used in the project was from the first approved batch of material. The Corps relied on these certifications and did not perform further tests of the waterstop until the government became aware that the second shipment of waterstop material differed in appearance from the initial samples. Upon discovery of a potential nonconformity, the Corps promptly tested the waterstop and notified Granite of the results. These findings are supported by substantial evidence. In light of Granite's repeated assurances, we cannot say that government acted unreasonably in foregoing further testing of the waterstop. Consequently, we conclude that the government should not be held accountable under the technical specifications for performance delays experienced by Granite on account of the untimely testing of the waterstop by the Corps.

### III.

### *The Strict Compliance Issue*

### A.

After its concrete work had been shut down by order of the Corps, Granite proposed several remedial methods which did not require removal of the waterstop. Granite first submitted a "cut and splice" method. This method involved splicing Vinylex waterstop, which had been approved by the Corps for other projects, onto the STG waterstop already embedded in the concrete. The proposal was rejected on the ground that it did not comply with the contract specifications. Thereupon, Granite requested the Corps to provide it with design criteria or calculations for the waterstop, so that Granite could hire a consultant to determine whether the STG waterstop was adequate for its intended purpose. However, the Corps declined on the ground that this was not necessary, because the government had determined that it would accept nothing less than the complete removal and replacement of the STG waterstop.

Granite next proposed a "rerouting method," whereby it would embed additional conforming waterstop into the concrete. The Corps rejected this and all other remedial proposals by Granite, because the STG waterstop did not meet the contract specifications.

On June 28, 1978, the Corps advised Granite in writing that total removal and replacement of the STG waterstop would be required. In compliance with this directive, Granite began removing and replacing the STG waterstop in accordance with the method approved by the Corps, and completed the task on October 6, 1978. The method approved by the Corps required Granite to remove the STG waterstop and surrounding concrete by pneumatic chipper and to insert Vinylex and new concrete. Ultimately, the Corps did allow Granite to leave about 50 to 100 feet of STG waterstop in place to avoid chipping large holes in the monoliths.

## B.

As a second ground for recovery, Granite contends that the Corps arbitrarily demanded strict compliance with the specifications by rejecting the STG waterstop without ever determining whether it was adequate for the Aberdeen project. Acknowledging that the waterstop did not literally meet the specifications, Granite argues that the government acted unreasonably in rejecting the embedded waterstop, because the material was far stronger than was necessary for the project and the cost of removing and replacing the waterstop was extraordinarily high. According to Granite, the government should have accepted the installed waterstop with a reduction in the contract price, because insistence on total removal resulted in economic waste. Granite therefore argues that the directive to remove and replace the waterstop constituted a constructive change to the contract.

In rejecting Granite's argument, the Board determined that the government was entitled to performance in strict compliance with provision CRD–C 572–74, and had the right to reject the waterstop rather than seek a price adjustment. The Board found that the Corps had "cogent reasons" for the need to tear out the waterstop and that the Corps performed "full technical evaluations of proposed alternative options" before ordering its removal.

## C.

Under clause GP–10(b) of the contract, the contractor was required to replace, without charge, any material which did not conform to the contract requirements "unless in the public interest, the Government consents to accept such material or workmanship with an appropriate adjustment in the contract price." The government therefore had the discretion to accept nonconforming waterstop if it was deemed adequate for the project. In addition, the government was required under clause GP–10 to consider the public interest when deciding whether to replace the nonconforming waterstop.

The Board's finding that the government performed full technical evaluations of the alternative options proposed by Granite is not supported by substantial evidence. The testimony of the government witnesses reveals that the Corps only considered whether the "cut and splice" and "rerouting" methods proposed by Granite would result in waterstop which met the literal requirements of the specifications. The Corps never determined whether the STG waterstop was sufficient for its intended purpose or whether the repair methods submitted by Granite would render the waterstop adequate for the project. After the Corps denied all proposals to leave the material in place, Granite provided the government with various means of removing the embedded STG waterstop from the concrete monoliths. While the government entertained proposals for total waterstop replacement, it insisted on complete removal of the waterstop without any evaluation of the technical necessity for the rework and thus did not exercise the discretion vested under clause GP–10. Therefore, we agree with the dissenting member of the Board that the only real criterion used by the government in directing the removal and replacement of the waterstop was strict compliance with the specifications. We also agree with his conclusion that the decision to reject the STG waterstop without consideration of the requisite performance standards for the Aberdeen project and without providing a rational basis for rejecting Granite's proposed repairs was arbitrary and capricious.

## D.

The contractor has the burden of proving that the proposed corrective work substantially complies with the specifications. *See Hunter Ditch Lining*, AGBCA No. 87–391–1, 91–2 B.C.A. (CCH) ¶ 23,673 at 118,565, 1991 WL 3968 (1991). In support of its claim, Granite presented an expert witness, Jerome Raphael, a professor of civil engineering with 18 years experience with the Bureau of Reclamation and the Corps in the design of concrete dams. He was associated with 50 dam construction projects, all of which contained waterstops.

During the four or five years prior to trial, Professor Raphael actively reviewed the design of six major dams as a member of consulting boards for owners and engineers. He analyzed the qualities of the embedded STG waterstop; compared these qualities with the conditions at the dam, and opined that the waterstop material ·exceeded the required performance standards of the Aberdeen project. After calculating project safety factors in a conservative manner, he acknowledged that the waterstop did not meet the specifications, but stated that the material exceeded the project safety margin some twenty-fold, while the remainder of the project had a safety factor of two. Professor Raphael also testified that the weakest waterstop had 16 times more capacity for joint elongation than necessary for the conditions at Aberdeen. He determined that the waterstop could withstand 40 times the water pressure that would ever exist at Aberdeen. He stated that the difference between the STG waterstop and the requirements of the specification for tensile strength was insignificant. In addition, Professor Raphael noted that the waterstop showed no signs of brittleness, cracking, or deterioration at the lowest recorded temperature in Aberdeen and explained that the waterstop would not fail at considerably lower temperatures, because it is insulated by the surrounding concrete and water.

In Professor Raphael's opinion, the waterstop embedded by Granite prior to June 22, 1978, was adequate to serve its intended purpose. He also testified that the "cut and splice" method proposed by Granite would have rendered the waterstop sufficient for the needs of the project. The government offered no testimony in rebuttal of the testimony of Professor Raphael.

The Board found that Professor Raphael's testimony "[was] not persuasive in asserting that the installed waterstop material would work anyway, especially when the failure of the waterstop in the finished project would be significant and extremely expensive to correct, if at all correctable." We are aware of and have given full consideration to the principle that the Board

may reject even uncontroverted expert testimony when it is intrinsically unpersuasive. *Sternberger v. United States*, 401 F.2d 1012, 1016, 185 Ct.Cl. 528 (1968). However, the record is devoid of any evidence indicating that the expert testimony was either exaggerated, inherently improbable, self-conflicting, or opinion not founded in fact. Furthermore, there was no issue regarding the credibility of Professor Raphael's testimony, because the board member who heard the testimony retired shortly after the hearing and did not participate in the decision.

Our review of the record shows that the Board's rejection of Professor Raphael's testimony was based on the testimony of Leo Cain, the Corps' design engineer, who testified substantially as the Board found. (Tr. 1035). However, Mr. Cain also testified that he made no technical evaluation or computations to determine whether the material installed by Granite was sufficient to serve its intended purpose. (Tr. 1080). The government offered no evidence, based on an analysis of the STG waterstop, that there was a reasonable probability that it would have to be replaced by the Corps if not removed. Consequently, we find that there was no rational basis for the Board's rejection of Professor Raphael's testimony. Therefore, we conclude, as the Court of Claims concluded in a similar case, that the only reasonable findings of fact that can be made on this issue are that the STG waterstop which had been installed by Granite was adequate for its intended purpose and also that the proposed "cut and splice" repair method would have been equally adequate for the project. *See John McShain, Inc. v. United States*, 462 F.2d 489, 494, 199 Ct.Cl. 364 (1972).

To the extent that the Board found that Granite failed to discharge its burden of proving substantial compliance with the waterstop specifications, the finding is not supported by substantial evidence.

E.

■ We recognize that the government generally has the right to insist on per-

formance in strict compliance with the contract specifications and may require a contractor to correct nonconforming work. *S.S. Silberblatt, Inc. v. United States*, 433 F.2d 1314, 1323, 433 F.2d 1314 (1970). However, there is ample authority for holding that the government should not be permitted to direct the replacement of work in situations where the cost of correction is economically wasteful and the work is otherwise adequate for its intended purpose. In such cases, the government is only entitled to a downward adjustment in the contract price. *Toombs & Co., Inc.*, ASBCA Nos. 34590 *et al.*, 91–1 B.C.A. (CCH) ¶ 23,403 at 117,433, 1990 WL 172728 (1990). *Cf. Farwell Co. v. United States*, 148 F.Supp. 947, 950, 137 Ct.Cl. 832 (1957). We have reviewed *Silberblatt* and other decisions cited by the Claims Court and by the Board and find that none of these cases involved a situation where the installed product substantially complied with the specifications and its removal would result in economic waste.

The concept of economic waste has long been recognized at common law. *See* the seminal case of *Jacob & Youngs v. Kent*, 129 N.E. 889, 230 N.Y. 239 (1921). The *Restatement of Contracts 2d*, § 348(2) endorses the economic waste approach for calculating damages in certain instances where defective performance is rendered. Section 348(2) provides that an owner may recover the reasonable cost of remedying defective work if that cost is not clearly disproportionate to the owner's loss in value. If the cost is disproportionate to the loss in value, then damages are limited to the diminution in the value of the property. Illustration 4 of § 348(2) is based on *Jacob & Youngs v. Kent.*

In addition, numerous state courts have utilized the economic waste rules. *See* Annotation, "Modern Status of Rule as to Whether Cost of Correction or Difference in Value of Structures is Proper Measure of Damages for Breach of Construction Contract," 41 A.L.R. 4th 131 (1985).

This principle has also been applied in cases involving government contracts. *Valley Asphalt Corp.*, ASBCA No. 17595, 74–2 B.C.A. (CCH) ¶ 10,680 at 50,770–71, 1974 WL 1974 (1974); *See Hunter Ditch Lining, supra; Toombs & Co., Inc.*, 91–1 B.C.A. (CCH) at 117,433; *Pacific Western Constr.*, ASBCA No. 28462, 86–2 B.C.A. (CCH) ¶ 18,816 at 94,824–25, 1985 WL 17348 (1985); *See also* J. Cibinic, Jr. and R. Nash, Jr., *Administration of Government Contracts*, 604–607 (2nd ed. 1986).

Although we have found no decision by this court which has considered the doctrine of economic waste, it was the rationale for the Court of Claims decision in *Eastern S.S. Lines v. United States*, 112 F.Supp. 167, 125 Ct.Cl. 422 (1953). In that case, the government chartered Eastern's vessel and was obligated upon the return of the ship to pay the company the amount required to restore the ship to its previous condition. The court held that the steamship company was not entitled to recover the costs of restoration where such costs would have been double the restored value of the ship. The court concluded that holding the government to a strict performance standard would constitute economic waste. 112 F.Supp. at 174–175. Similarly, in *H.L.C. & Assoc. Constr. Co. v. United States*, 367 F.2d 586, 176 Ct.Cl. 285 (1966), the court discussed the economic waste doctrine but determined that the case did not support a finding of economic waste. 367 F.2d at 600.

F.

Granite claims that the cost of removing and replacing the waterstop was $3.8 million. Although the Board never reached the issue of damages in this case, it found that Granite obtained a judgment of $894,750 against two suppliers and that Granite settled with two other suppliers for $400,000. At trial, the attorney for the government conceded that Granite had incurred costs, including delays, of more than $400,000 in removing and replacing the waterstop. (Tr. 997). The removed waterstop initially cost Granite $5,752.80. After a careful review of the whole record, we hold that the Corps' requirement that the waterstop be torn out and replaced result-

ed in economic waste. *See Toombs & Co., Inc., supra.*

The Corps made no effort to evaluate the quality of the waterstop in relation to the needs of the Aberdeen project. Had it done so, the record shows that the Corps would have discovered that the waterstop was entirely adequate for the project and that its replacement was unnecessary. Rather than allowing the STG waterstop to remain in place, the Corps required Granite to engage in an economically wasteful course of performance. Under the circumstances, the only reasonable remedy available to the government was a downward adjustment in the contract price. Therefore, the directive to remove and replace the waterstop constituted a constructive change under the Changes clause of the contract. *Arnold M. Diamond, Inc.,* ASBCA No. 15063, 73–2 B.C.A. (CCH) ¶ 10,-359 at 48,925, 1973 WL 1507 (1973).

### CONCLUSION

For the foregoing reasons, we conclude that Granite is entitled to an equitable adjustment for the cost of removing and replacing the STG waterstop. Any recovery against the government shall be reduced by the reasonable cost Granite would have incurred if it had been permitted to repair the waterstop with its "cut and splice" method. Granite's recovery shall also be reduced by any other credits and offset due the government.[3]

Accordingly, the judgment of the Claims Court is reversed and the case is remanded to that court with instructions to enter summary judgment in favor of Granite. The Claims Court is further directed to remand the case to the Board for a determination of the amount which Granite is entitled to recover, consistent with this opinion.

---

**3.** During the trial before the Board, the government's attorney argued that the amount which Granite recovered from its suppliers, particularly the $400,000 settlement, should be offset against any recovery which Granite obtains from the government. (See Tr. 998). The issue of quantum is not before us and the question as

### COSTS

Each party shall bear its own costs.

## REVERSED AND REMANDED.

to whether Granite's recovery should be reduced by the amount collected from its suppliers has not been briefed. We intimate no opinion on this issue, which is a matter to be decided by the Board as a part of its determination of the quantum of recovery.