6 F.3d 786
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 WALTER-THOSTI-BOSWAU AG, Appellant,
v.
Michael P.W. STONE, Secretary of the Army, Appellee.
 No. 92-1398.
 United States Court of Appeals, Federal Circuit.
 Sept. 3, 1993.
 
 Before ARCHER, Circuit Judge, COWEN, Senior Circuit Judge, and MICHEL, Circuit Judge.
 ARCHER, Circuit Judge.
 
 
 1
 Walter-Thosti-Boswau AG (WTB) appeals from the decision by the Armed Services Board of Contract Appeals (board), Walter-Thosti-Boswau AG v. Secretary of the Army, ASBCA No. 37973, 92-2 B.C.A. (CCH) p 24,841 (1992), in which the board upheld the contracting officer's (CO) decision denying WTB's claim for an equitable adjustment. We affirm.
 
 I.
 
 2
 A. The United States Army Corps of Engineers (Army) and WTB entered into a firm, fixed-price, lump-sum contract on September 19, 1987 for the renovation of military housing in Erlangen, Germany. Upon completion of the contract, WTB filed with the contracting officer a claim for an equitable adjustment in the amount of DM 469,050 (approximately $317,269 in United States currency). WTB's claim for an equitable adjustment was based on the fact that the Army required WTB to install impregnated (moisture-proof) gypsum board panels on the ceilings of all rooms in the renovated apartments. WTB maintains, under a correct construction of the terms of the contract, it was required to install the ceiling panels only in "wet rooms," i.e., bathrooms. The contracting officer denied the claim and on appeal his decision was upheld by the board.
 
 
 3
 The contract between the Army and WTB was executed on Standard Form 1442 and is divided into sections as follows:
 
 Composition of Solicitation/Award:
 
 4
 1. Part I Schedule ...
 
 
 5
 Part II Instructions, Conditions and Notices ...
 
 
 6
 Part III Special Contract Requirements ...
 
 
 7
 Part IV Contract Clauses ...
 
 
 8
 2. Specifications and Drawings ...
 
 
 9
 Section 2 contains a "Preface to Specifications" describing the work to be done under the contract. Paragraph 3.1.5 headed "Complete Bathroom Renovation" provides under a subheading "Ceilings":
 
 
 10
 Ceilings: Impregnated moisture-proof gypsumboard panels, painted with enamel paint.
 
 
 11
 Paragraph 3.1.6 entitled "Renovation of Damaged Plaster and Finish Areas" provides:
 
 
 12
 Walls and Ceilings: In living, dining and bedroom areas, as well as corridor areas, all wall and ceiling plaster incl. reed mats will be removed. Walls to be provided with machine-applied gypsum plaster MG-PIVa, ceilings with gypsum board panels.
 
 
 13
 Section 2 also includes the "Master Specifications" covering particular categories of work. It provides in Item 03.02.0503:
 
 
 14
 Ceiling lining with impregnated gypsumboard panels for wet rooms, board width 625 mm, board thickness 12.5 mm incl. suspension system of galvanized C-sections, suspension height approx. 150 mm to 250 mm. Joints shall be filled, reinforced, and spackled.
 
 
 15
 Included among the drawings is Drawing No. A5 entitled "Interior Finished Schedule Standard Building VA." Although labelled a drawing, Drawing No. A5 is actually a table delineating the specific materials required for the interior finish for each type of room in the housing units. Drawing No. A5 shows that ceiling linings are required in bathrooms, dining rooms, living rooms, bedrooms, halls, stairs, corridors and toilets.
 
 
 16
 In addition to the contract documents, the Army furnished the contractor with a schedule entitled "Cost and Quantities Breakdown." This document was only informational as expressly noted on the face of the solicitation document, Standard Form 1442, which stated: "NOTE: Cost and Quantities Breakdown ... furnished for information only." On the first page of this schedule paragraph 1 gives the following notice to contractors:
 
 
 17
 All items of work described in the specifications and shown on the drawings are included in this "bid schedule". There are no quantities shown in this "bid schedule". It is the intent that each contractor will estimate his own quantities and unit prices for all listed work items and record his total lump sum bid prices in the accompanying "Cost Summary" Part No. I.
 
 
 18
 The board found that "[t]his document was not returned to the Government with the offers." While the schedule contains a listing of various items of work, each with numerical designations corresponding to subsections in the "Master Specifications," the only reference to ceiling panels is Item 03.02.0503, entitled "Ceiling Lining Impregnated." The corresponding item in the "Master Specifications" required impregnated gypsum board panels for wet rooms.
 
 
 19
 The contract in Part II, "Instructions, Conditions and Notices," contains a provision incorporating Federal Acquisition Regulations (FAR) Sec. 52.215-14, entitled "Explanation to Prospective Offerors" which sets forth the manner in which a prospective bidder can seek an explanation or interpretation of the solicitation document before bidding.
 
 
 20
 Any prospective offeror desiring an explanation or interpretation of the solicitation, drawings, specifications, etc., must request it in writing soon enough to allow a reply to reach all prospective offerors before the submission of their offers. Oral explanations or instructions given before the award of the contract will not be binding. Any information given to a prospective offeror concerning a solicitation will be furnished promptly to all other prospective offerors as an amendment of the solicitation, if that information is necessary in submitting offers or if the lack of it would be prejudicial to any other prospective offerors.
 
 
 21
 Part II of the contract also incorporates FAR Sec. 52.215-33, which provides for an order of preference among the contract documents, as follows:
 
 
 22
 Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits and attachments; and (e) the specifications.
 
 
 23
 Part IV of the contract, entitled "Contract Clauses," contains FAR Sec. 52.236-21, entitled "Specifications and Drawings For Construction." Subsection (a) of this clause indicates how discrepancies in the specifications and drawings are to be resolved by providing:
 
 
 24
 The Contractor shall keep on the work site a copy of the drawings and specifications and shall at all times give the Contracting Officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at its own risk and expense. The Contracting Officer shall furnish from time to time such detailed drawings and other information as considered necessary, unless otherwise provided.
 
 
 25
 WTB's bid proposal was prepared by its employee, Udo Balzer. In calculating the price to be bid for the ceiling panels, Mr. Balzer compared Item 03.02.0503 of the "Cost and Quantities Breakdown" with the corresponding section of the "Master Specifications." He concluded that impregnated gypsum board panels were to be placed only in the wet rooms, and that the ceilings in the other rooms of the building were to be repaired by re-plastering and painting. He testified that his calculations were based exclusively on the schedule in the "Costs and Quantities Breakdown." To determine the square meter requirements for the panels, he referred to the drawings and included the quantity of ceiling lining that was needed for installing panels in the wet rooms only.
 
 
 26
 In preparing WTB's unit price bid for the ceiling work, Mr. Balzer recognized that Paragraph 3.1.6 of the "Preface to the Specifications," providing for the installation of gypsum board panels on the ceilings of the living rooms, dining rooms, and bedroom areas, was inconsistent with Item 03.02.0503 of the "Master Specifications." Mr. Balzer was also aware that his interpretation of the specifications did not conform with the requirements of Drawing No. A5. However, neither Mr. Balzer nor any other representative of WTB made a pre-bid inquiry of the contracting officer regarding these inconsistent provisions of the contract. In explaining why he did not submit the question to the contracting officer for a written determination, Mr. Balzer testified that he did not consider that there was any disharmony in the specifications and drawings because there was no item in the "Costs and Quantities Breakdown" schedule calling for ceiling panels in any of the rooms except the wet rooms. Consequently, it was his interpretation of the contract that ceiling panels were required only in the wet rooms.
 
 
 27
 Approximately four weeks after the contract was awarded to WTB, the Army required WTB to install impregnated gypsum board on the ceilings of all rooms in the housing units. WTB complied with the Army's requirements and submitted a claim to the contracting officer for an equitable adjustment for the cost of installing ceiling lining in non-wet rooms.
 
 II.
 
 28
 Contract interpretation is a question of law that we review de novo. Reliance Ins. Co. v. United States, 931 F.2d 863, 865 (Fed.Cir.1991). The board's decision is nevertheless accorded careful consideration because the interpretation of a contract by a tribunal having expertise is helpful even if not compelling. Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1429 (Fed.Cir.1990); Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed.Cir.1985). When possible, a contract must be interpreted as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions. Granite Constr. Co. v. United States, 962 F.2d 998, 1003 (Fed.Cir.1992).
 
 
 29
 A. WTB contends that if the language of the contract is interpreted from the point of view of a reasonable contractor, WTB was required to install moisture-proof panels only in wet rooms and not required to install any ceiling lining in the remaining rooms of the housing units. We are persuaded that this is not a reasonable interpretation of the contract, and that the board properly interpreted the contract as requiring ceiling linings throughout the rooms of the housing units.
 
 
 30
 Paragraph 3.1.6 in the "Preface to the Specification" unequivocally requires that ceiling plaster in living, dining, bedroom and corridor areas is to be removed and replaced with gypsum board panels:
 
 
 31
 In living, dining and bedroom areas, as well as corridor areas, all wall and ceiling plaster incl. reed mats will be removed. Walls to be provided with machine-applied gypsum plaster MG-PIVa, ceilings with gypsum board panels.
 
 
 32
 Drawing No. A5 also specifies the particular rooms in which ceiling linings are to be installed. The table represented in Drawing No. A5 shows that ceiling linings are required to be installed in bathrooms, dining rooms, living rooms, bedrooms, halls, stairs, corridors and toilets.
 
 
 33
 WTB does not contest these requirements, but instead argues that Item 03.02.0503 of the "Master Specifications" would lead a reasonable contractor to interpret the contract as requiring ceiling linings only in wet rooms. Item 03.02.0503, however, does not limit the installation of ceiling linings to wet rooms only. It simply describes the exact type of impregnated gypsum board to be used in wet rooms and how it is to be installed.[1]
 
 
 34
 WTB also asserts that the "Cost and Quantities Breakdown," supplied to offerors, albeit "for information only," would lead a reasonable contractor to interpret the contract as requiring ceiling linings only in wet rooms. WTB notes that the "Cost and Quantities Breakdown" tells offerors that it includes all work to be performed on the buildings, yet Item 03.02.0503, pertaining to wet rooms, is the only listed item for ceiling linings. WTB was not entitled to rely on the "Cost and Quantities Breakdown," however, because it was not a part of the contract and was provided to prospective offerors for information only.[2] Even if the "Cost and Quantities Breakdown" were part of the contract, it was unreasonable for WTB's representative to ignore the requirements of Paragraph 3.1.6 and Drawing No. A5 because the contract can be interpreted in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions. See Granite Construction Co., 962 F.2d at 1003. Paragraph 3.1.6, Drawing No. A5, and Item 03.02.0503 can be read harmoniously to require ceiling linings installed in all rooms and impregnated lining in wet-rooms.
 
 
 35
 B. WTB also contends that if the contract can be interpreted to require ceiling lining in all the rooms, it is ambiguous. WTB urges, therefore, that the doctrine of contra proferentum should apply and the contract should be construed against the Army as drafter of the contract. Again, we cannot agree.
 
 
 36
 The doctrine of contra proferentum is not applicable where before bidding the contractor fails to seek clarification of a patent ambiguity of which it was aware or should have been aware. Fortec, 760 F.2d at 1291. A patent ambiguity gives rise to a duty of inquiry. Id. Moreover, in this case, the contract incorporated FAR sections 52.215-14 and 52.236-21 informing contractors to seek interpretations or determinations from the contracting officer regarding inconsistencies in the specifications or drawings.
 
 
 37
 The contractor clearly knew of the inconsistency or ambiguity in the instant contract. In preparing its bid, WTB's employee recognized that Paragraph 3.1.6 and Drawing A5 were inconsistent with his interpretation of Item 03.02.0503. Nonetheless, WTB did not make any pre-bid inquiry. Under WTB's reading of the pertinent contract clauses, any ambiguity that may be present must be viewed as a patent ambiguity. Construed as the Army argues, the clauses present no ambiguity.
 
 
 38
 The doctrine of contra proferentum also will not be applied where the contractor's interpretation of the contract is not reasonable. See Fort Vancouver Plywood Co. v. United States, 860 F.2d 409, 414 (Fed.Cir.1988). As discussed, we are not persuaded that WTB's interpretation of Item 3.02.0503 to require ceiling panels only in wet rooms is reasonable in view of the other provisions of the contract clearly indicating that all rooms were to have ceiling panelling. Because WTB neither sought clarification of a patent ambiguity nor reasonably interpreted the pertinent provisions of the contract, the doctrine of contra proferentum is inapplicable.
 
 
 39
 We have considered WTB's other arguments and do not consider them persuasive. For the foregoing reasons, the decision of the board is affirmed.
 
 
 40
 COWEN, Senior Circuit Judge, concurs in the result.
 
 
 
 [1]
 The government contends that "impregnated gypsum board panels for wet rooms" as used in subsection 3.02.0503 is descriptive of the ceiling panels to be used throughout the housing units and not indicative of the location for installing impregnated panels, i.e., in bathrooms only. We need not decide whether the Government's construction of this clause is correct because WTB does not argue for an interpretation that the contract requires moisture-proof panels in bathrooms and regular gypsum board panels in other rooms. WTB's argument is that no panelling is required in the other rooms
 
 
 [2]
 WTB urges that the decision in Foster Construction C.A. & Williams Brothers, Co. v. United States, 435 F.2d 873, 888 (Ct.Cl.1970), supports its contention that it was justified in relying on the "Costs and Quantities Breakdown" to prepare its bid. The decision in Foster, however, does not support this. At issue was a clause included in the contract relating to changed conditions. The court held that "the duty to make an inspection of the site does not negate the changed conditions clause by putting the contractor at peril to discover hidden subsurface conditions. Id